CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

SEP 15 2023

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| ZAFAR A., | ) | |
| Plaintiff, | ) | Civil Action No. 4:22-cv-00017 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Zafar A. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying his application for disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434.[1] The case is before me

by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is

supported by substantial evidence. Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C.

§ 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] Zafar also applied for supplemental security income ("SSI") under Title XVI of the Social Security Act,
42 U.S.C. §§ 1381–1383f. *See* Pl.'s Br. 1–2, ECF No. 13. Zafar does not appeal the Commissioner's final
decision granting that application. *See id.* at 30.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or

equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[2] The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

In June 2019, Zafar filed for DIB and SSI alleging disability based on several medical

impairments, including fibromyalgia, psoriatic arthritis, seronegative arthritis, epicondylitis in

the left elbow, myocardial infarction, and asthma. *See* Administrative Record ("R.") 133–34,

343–44. He alleged disability beginning February 13, 2012, which was the same day he stopped

working. *See* R. 121, 397. Zafar was forty-five years old, or a "younger person" under the

regulations, at that time. R. 121; 20 C.F.R. §§ 404.1563(c) 416.963(c). On his fiftieth birthday in

July 2016, however, he moved into the "closely approaching advanced age" category. R. 133; 20

C.F.R. §§ 404.1563(d), 416.963(d). Disability Determination Services ("DDS"), the state

agency, denied Zafar's claims initially in September 2019, R. 128–30, 131–43, and upon

reconsideration in March 2020, R. 144–64, 165–87. As to the DIB claim, DDS reviewers found

that Zafar had not worked since February 13, 2012, and that he met the Act's insured-status

requirements through December 31, 2017.[3] *See* R. 120–21, 125–26, 146–47, 159–60.

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the Commissioner's final written decision.

[3] The latter date is called the date last insured, or "DLI." R. 125; *see Bird v. Comm'r of Soc. Sec. Admin.*,
699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Zafar] must prove that []he became disabled
prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 655–56. Thus, the relevant period for
that claim is February 13, 2012, through December 31, 2017. *See* R. 120–21, 125. Those dates are not
relevant to Zafar's SSI claim, however, because SSI benefits cannot be paid for any period before the

In November 2020, Zafar appeared with counsel before ALJ Henry H. Chambers for a brief administrative hearing. *See* R. 106–15. Zafar's attorney argued that his severe psoriatic arthritis, seronegative arthritis, and fibromyalgia met or medically equaled Listing 14.09, which sets out criteria for presumptively disabling inflammatory arthritis. R. 111–13. ALJ Chambers thought it was "a pretty close call" whether Zafar met or equaled that Listing before his DLI. R. 112–13. Thus, he ordered a supplemental hearing where a medical expert ("ME"), possibly a rheumatologist, could testify as to Zafar's impairment-related symptoms and limitations in 2012–2017. *See id.* On March 23, 2021, Zafar appeared with counsel and testified very briefly at a supplemental hearing before ALJ Chambers. R. 100–02. Internist Kweli Amusa, M.D., testified and offered her medical opinion about Zafar's conditions both before his DLI and after June 2019. R. 67–87. A vocational expert ("VE") also testified at this hearing. R. 89–99.

On April 23, 2021, ALJ Chambers issued a "partially favorable" decision in which he denied Zafar's DIB claim in its entirety, but granted his SSI claim and awarded disability benefits beginning in June 2019. *See* R. 31–56. As to the DIB claim, ALJ Chambers explained that the relevant period ran from February 2012 through December 31, 2017, Zafar's DLI. R. 34–42. The relevant period for Zafar's SSI claim, on the other hand, ran from "June 26, 2019, the established disability onset date," R. 34, through April 23, 2021, the date of the ALJ's decision, R. 45.

Looking at the DLI timeframe, ALJ Chambers found Zafar had the following "severe" medically determinable impairments ("MDIs") before December 31, 2017: "obesity, inflammatory arthritis, . . . fibromyalgia, status-post right lateral epicondylitis and left elbow

---

month in which he filed his SSI application. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014). Zafar filed for SSI in June 2019. *See* R. 133.

epicondylitis debridement and anconeus flap, degenerative joint disease (DJD) . . . epicondylitis

of the left elbow, and carpal tunnel."[4] R. 34; *accord* R. 70–76 (ME testimony). Those

impairments did not meet or equal the Listings for "[a]bnormality of major joint(s) in any

extremity," 20 C.F.R. pt. 404, subpt. P, app. § 1.18, or chronic inflammatory arthritis, *id.* §

14.09. *See* R. 36–37 (citing 20 C.F.R. pt. 404, subpt. P, app. §§ 1.18, 14.09(A)–(B)). ALJ

Chambers then evaluated Zafar's residual functional capacity ("RFC") from February 2012

through December 2017. *See* R. 38–42. He found that Zafar could perform "light work"[5] except

that he could only "stand and walk for 4 to 6 hours" in an eight-hour workday and never climb

ladders, ropes, or scaffolds, but could do "all other postural maneuvers occasionally[.]" R. 38;

*accord* R. 183–84 (DDS medical opinion assessing full light RFC with occasional postural

activities based on treatment record dated February 2019–February 2020).

       As part of his RFC analysis, ALJ Chambers found that Zafar's MDIs "could reasonably

be expected to cause [his] alleged symptoms," but that his subjective "statements concerning the

intensity, persistence, and functionally limiting effects of these symptoms [were] not fully

supported prior to December 31, 2017, for the reasons explained [elsewhere] in []his decision."

---

[4] ALJ Chambers also found that Zafar had "severe" asthma, as well as numerous "nonsevere" physical and mental MDIs during this time. R. 34–35. Zafar's arguments on appeal focus on the Commissioner's findings related to his severe fibromyalgia and inflammatory arthritis. *See generally* Pl.'s Br. 21–30. Accordingly, my summary of the record also focuses on evidence most relevant to those MDIs and their alleged functionally limiting effects.

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these strength demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983). The DDS physician who reviewed Zafar's disability claims in September 2019 found that Zafar "currently" could lift/carry and push/pull ten pounds frequently and twenty pounds occasionally, and sit and stand/walk for "[a]bout 6 hours [each] in an 8-hour workday." R. 140. Another DDS physician adopted that finding in March 2020. R. 183–84.

R. 38. Later, the ALJ explained that "the record as a whole" did not support "work preclusive

limitations" before Zafar's DLI because his "treatment notes" showed that "he was doing well

after undergoing right and left elbow surgeries with 5/5 motor strength and normal reflexes" in

2012–2013, and Zafar received "conservative treatment of medication" for inflammatory arthritis

and fibromyalgia, which "ha[d] been effective, although [he] was non-compliant with taking his

medication." R. 41. ALJ Chambers also noted that both Dr. Amusa and Zafar's treating

rheumatologist, David Leverenz, M.D., had opined that fibromyalgia and inflammatory arthritis

symptoms would have limited Zafar to at most "sedentary work"[6] before December 31, 2017.

*See* R. 42. He rejected those medical opinions because they were neither "supported by" nor

"consistent with" the same medical evidence he cited to discount Zafar's symptoms and reported

functional limitations. *Id.*

At step four, ALJ Chambers found that a "light" RFC ruled out Zafar's return to his past

relevant work as a tire technician. R. 44. Based on the VE's hearing testimony, however, ALJ

Chambers found that Zafar's light RFC and "younger" age classification "prior to" June 2019

would have allowed him to transition to less-demanding occupations like ink printer, document

preparer, and dial marker. R. 44–45 (citing R. 93–97). Accordingly, ALJ Chambers found that

Zafar was "not disabled . . . at any time through" December 31, 2017. R. 46. He denied Zafar's

DIB claim on that ground. *Id.*

Looking at records from February 2019 forward, *see* R. 43, ALJ Chambers found that

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). Aside from the amounts of weight lifted and carried, "[t]he major difference between sedentary and light work is that most light jobs" require standing or walking for "most of the workday." SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires six hours of standing and/or walking during an eight hour-day, SSR 83-10, 1983 WL 31251, at *5–6, while sedentary work only requires about two hours, *Neal*, 2010 WL 1759582, at *2.

6

Zafar had "severe" ischemic heart disease and coronary artery disease status-post myocardial infarction in addition to his preexisting severe MDIs, R. 34. The functionally limiting effects of those MDIs and their related symptoms as of June 26, 2019—i.e., the date Zafar filed for SSI—were significant enough to reduce Zafar's exertional RFC from "light" work to "sedentary" work. R. 43. In reaching that conclusion, ALJ Chambers fully credited both Zafar's statements describing his allegedly disabling symptoms—including "chronic fatigue" and "diffuse pain in multiple joints"—and Dr. Amusa's medical opinion that Zafar was (still) limited to sedentary work as of June 2019. R. 43; *see* R. 79–80, 88. Zafar was 52 years old, or "closely approaching advanced age" under the regulations, at that time. R. 44. ALJ Chambers concluded that, based on Zafar's age, education, and sedentary RFC, the regulations directed a finding of "disabled" as of June 26, 2019. R. 45 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.14). He granted Zafar's SSI claim on that ground. *Id.*

\*

Zafar promptly asked the Appeals Council ("AC") to review ALJ Chambers's decision denying his DIB claim. R. 324. In November 2021, the AC granted Zafar's request because one part of the hearing-level decision was "not supported by substantial evidence." R. 326–27. Specifically, in finding Zafar "not disabled" at step five, ALJ Chambers "relied on representative *sedentary* unskilled occupations" that Zafar could have performed before his insured status expired on December 31, 2017. R. 327 (emphasis added); *see* R. 45, 95–96. Because Zafar turned 50 years old in July 2016, however, the regulations would direct a finding of "disabled" if Zafar was in fact limited to sedentary work before his DLI. R. 327; *see* 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.14. The AC explained that ALJ Chambers found Zafar had a light RFC before that date and that the VE had identified several "light" occupations that a hypothetical person

with this RFC and Zafar's vocational profile could perform. R. 327–28; *see* R. 37–38, 92–95.

Thus, the AC proposed to make its own decision that Zafar was "not disabled" before his DLI,

adopting ALJ Chambers's specific findings and conclusions at steps one through four, *see* R.

327–29, but "clarifying" that the DIB denial at step five relied on the VE's testimony about light

jobs available in the national economy, R. 327, 329. It agreed with ALJ Chambers's decision that

Zafar "became disabled on June 26, 2019." R. 327.

     The AC issued a written decision on January 21, 2022. *See* R. 7–19. It summarily

adopted ALJ Chambers's findings about Zafar's severe MDIs and light RFC, R. 15–16, 17–18;

*see* R. 34–38, and his specific reasons why Zafar's "subjective complaints" describing more

significant limitations were "not fully consistent with the medical evidence," R. 18; *see* R. 41. It

also agreed that a light RFC ruled out Zafar returning to his past work as a tire technician. R. 16;

*see* R. 44–45. Based on the VE's testimony, however, the AC found Zafar was "not disabled"

between February 2012 and December 31, 2017, because he still could have performed certain

"light unskilled occupations" available in the national economy, like garment sorter, marker, and

checker. *See* R. 16 (citing R. 93–95). It agreed Zafar was entitled to SSI as of June 26, 2019. R.

18–19. The AC's decision is the "final decision of the Commissioner" on Zafar's DIB and SSI

claims. R. 7. Zafar now appeals the Commissioner's denial of his DIB claim. Pl.'s Br. 1–2, 30.

### III. Discussion

     Zafar's arguments on appeal focus on the ALJ's and the AC's evaluation of subjective

evidence relevant to the intensity, persistence, and functionally limiting effects of his severe

fibromyalgia and inflammatory arthritis during the DLI timeframe. *See generally* Pl.'s Br. 21–29

(Dr. Leverenz's and Dr. Amusa's medical opinions), 29–30 (Zafar's symptoms). The medical

opinions, in particular, support Zafar's argument that his severe MDIs limited him to at most

"sedentary" work before December 31, 2017. *Id.* at 13–14 (citing R. 2247–55); *id.* at 19 (citing R. 77–78, 88); *see also* R. 42 (citing R. 77–78, 86–88, 2247–55). Thus, had the ALJ or the AC found those opinions persuasive, *see* 20 C.F.R. § 404.1520c, and found that Zafar had a "sedentary" rather than "light" RFC, the regulations would have directed a finding that Zafar was "disabled" when he turned fifty years old in July 2016. *See* Pl.'s Br. 23 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.14); R. 14, 327. The Commissioner responds that ALJ Chambers "properly discounted" these medical opinions "because [they were] not supported by or consistent with the totality of the record showing that [Zafar's] conditions were managed with medication and physical therapy" before his DLI. Def.'s Br. 1, ECF No. 20.

Zafar has the better argument. *See, e.g., Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95–98, 102, 108–09 (4th Cir. 2020) (instructing ALJs that they cannot rely on certain kinds of medical evidence (or lack thereof) to discount subjective complaints and medical opinions concerning symptoms and functional limitations caused by fibromyalgia or similar disorders); *Lisa T. v. Comm'r of Soc. Sec. Admin.*, No. 5:21cv68, 2023 WL 2423591, at *3, *5–6 (W.D. Va. Mar. 9, 2023) (Hoppe, M.J.) (recommending reversal and remand where ALJ relied on irrelevant evidence when discounting medical opinion describing claimant's fibromyalgia symptoms and overlooked medical evidence supporting the opinion), *adopted*, 2023 WL 2632821 (W.D. Va. Mar. 24, 2023) (Cullen, J.); *Paul B. v. Kijakazi*, No. 6:20cv78, 2022 WL 989242, at *4–5 (W.D. Va. Mar. 31, 2022) (citing 20 C.F.R. § 404.1520c)). Before explaining why the Commissioner's final decision denying Zafar's DIB claim should be reversed and remanded, however, the court must determine which written decision(s) in the record—the ALJ's, the Appeals Council's, or both—is subject to judicial review under 42 U.S.C. § 405(g). *See generally Kellough v. Heckler*, 785 F.2d 1147, 1149–51 (4th Cir. 1986); *Parris v. Heckler*, 733 F.2d 324, 326 (4th Cir. 1984).

\*

Section 405(g) allows "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party," to file a civil action in his local federal district court seeking judicial review of that decision. 42 U.S.C. § 405(g). "The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.* "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" *Id.*

Usually, a Social Security ALJ conducts the required hearing after the state agency has denied the claim in two disability determinations. *See Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019). ALJs must "issue a written decision that gives the findings of fact and reasons for the decision" based on all the "evidence offered at the hearing or otherwise included in the record." 20 C.F.R. § 404.953(a). Unless the Appeals Council grants review, the ALJ's hearing-level decision is the "final decision of the Commissioner" subject to judicial review under 42 U.S.C. § 405(g). *See Meyer*, 662 F.3d at 705–06. Critically, substantial-evidence review must stay within the four corners of the ALJ's written decision. *See, e.g.*, *Bates v. Berryhill*, 725 F. App'x 959, 960 (4th Cir. 2018) ("The agency seeks to avoid remand by offering several justifications for the ALJ's [adverse] finding, but the ALJ's written decision contains none of those justifications."); *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (instructing that "it is not [the court's] role to speculate as to how the ALJ applied the law to its findings" if they failed to explain as much in their written decision); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) (noting that the court may "affirm the ALJ's decision only upon the reasons he gave" in the written decision).

Here, the Appeals Council reviewed ALJ Chambers's decision, R. 326 (citing 20 C.F.R. § 404.470(a)(3)), and then "issue[d] its own decision" denying Zafar's DIB claim, 20 C.F.R. § 404.979. *See* R. 14–20. Thus, the AC's decision (not the ALJ's decision) is the "final decision of the Commissioner of Social Security" subject to judicial review under § 405(g). *See Kellough*, 785 F.2d at 1149–51; 20 C.F.R. § 404.981. The AC's written decision summarily adopted ALJ Chambers's light RFC finding for the pre-DLI period, R. 17, and concluded without explanation that Zafar's "subjective complaints [were] not fully consistent with the medical evidence for the reasons identified in the body of the [ALJ's] hearing decision," R. 18. It does not mention the medical-opinion evidence at all. *See* R. 16–18; 20 C.F.R. § 404.1520c(a). Thus, the AC's written decision lacks both an adequate "discussion of which evidence the [AC] found credible and why, and specific application of the pertinent legal requirement to the record evidence," *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). If the court must limit its substantial-evidence review to the AC's written decision alone, the Commissioner's final decision denying Zafar's DIB claim should be reversed and remanded simply because "there is nothing on which to base [that] review." *Fox*, 632 F. App'x at 755 (citing *Radford*, 734 F.3d at 295). *Cf. Tina B. v. Comm'r of Soc. Sec.*, No. 3:19cv74, 2021 WL 713208, at *2–3 (W.D. Va. Feb. 22, 2021) (recommending reversal and remand where AC's written decision "'failed to build an accurate and logical bridge from the evidence [it] recounted' to its conclusion about Tina's exertional abilities, and did not adequately explain why it rejected three physicians' medical opinions that Tina should be restricted to [less demanding] exertional work" (quoting *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)), *adopted*, 2021 WL 890554 (W.D. Va. Mar. 9, 2021).

Fourth Circuit caselaw suggests that the Appeals Council must explain its findings and conclusions only in cases where the AC's decision conflicts with the ALJ's initial determination.

*See, e.g.*, *Kellough*, 785 F.3d at 1149–51 & n.5. *But cf. Meyer*, 662 F.3d at 706 (noting that the AC is "required to make findings of fact and explain its reasoning" when it grants "review and issues its own decision on the merits," but relying on a prior regulation that explicitly required the Appeals Council to explain the weight afforded to certain evidence when it makes its own decision, 20 C.F.R. § 404.1527(f)(3) (2010)). Similarly, the regulations appear to allow the AC to summarily adopt findings and reasons from the ALJ's written hearing-level decision when the AC grants review and issues its own decision on the merits. *See* 20 C.F.R. § 404.979. In those cases, the court may look through the AC's decision to determine if the ALJ's written decision supports the Commissioner's final decision. *See, e.g.*, *Gorrell v. Saul*, 3:18cv538, 2019 WL 3939065, at *6, 14–15 (E.D. Va. July 31, 2019), *adopted*, 2019 WL 3936437 (E.D. Va. Aug. 20, 2019); *Cunningham v. Berryhill*, No. 3:16cv2525, 2017 WL 1259587, at *4 (S.D. W. Va. Mar. 31, 2017) (citing *Arbogast v. Bowen*, 860 F.2d 1400, 1402 (7th Cir. 1988)); *Davis v. Colvin*, No. 5:13cv98, 2015 WL 404213, at *11 (W.D.N.C. Jan. 29, 2015). Here, Zafar is only challenging the AC's decision to adopt ALJ Chambers's finding that he could do "light" work during the DLI timeframe. Both parties' briefs also focus on the substance of ALJ Chambers's narrative RFC analysis rather than the AC's written decision adopting his light RFC finding. *See generally* Pl.'s Br. 21–30; Def.'s Br. 9–15. The court will follow their lead.

**

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite their medical impairments and symptoms. SSR 96-8p, 1996 WL 374194, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect

specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.,* 873 F.3d 251, 268–72 (4th Cir. 2017), and his written decision builds an "accurate and logical bridge from that evidence to [their] conclusion," *Woods*, 888 F.3d at 694 (cleaned up).

ALJ Chambers's RFC analysis does not satisfy "this deferential standard" of review. *Arakas*, 983 F.3d at 95. First, he did not logically explain why Dr. Leverenz's and Amusa's medical opinions were "neither supported by the medical evidence . . . nor consistent with the record as a whole" before December 30, 2017, R. 42, or why he adopted the DDS physicians' opinions that Zafar could do light work, R. 41. *See* 20 C.F.R. § 404.1520c(a)–(c). Second, he did not account for the unique characteristics of fibromyalgia and inflammatory arthritis, which were the primary medical bases for Drs. Leverenz's and Amusa's opinions and proposed exertional limitations. *See generally Arakas*, 983 F.3d at 95–98, 102, 108–09 (instructing ALJs that they cannot rely on certain kinds of medical evidence (or lack thereof) to discount medical opinions concerning symptoms and functional limitations caused by fibromyalgia and similar disorders).

A.    *Summary*

Zafar used to build tires for Goodyear Tire & Rubber Company. R. 398. From June 2005 until February 2012, he worked twelve hours a day, four days a week. *Id.* He spent six-to-eight hours each workday standing/walking, reaching, and handling both small and large objects. R. 399. In early 2012, Zafar complained of pain and tenderness in both elbows. *See* R. 1655. An

MRI revealed acute lateral epicondylitis with likely partial avulsion in the right elbow and mild

lateral epicondylitis in the left. R. 1653–55. That September, Zafar had debridement surgery on

the right elbow with anconeus rotational flap, posterior interosseus nerve decompression for

radial tunnel syndrome, and reconstruction of the lateral collateral ligament. R. 1399.

In March 2013, Zafar told his orthopedic surgeon that he had realized "fifty percent

improvement" after his right-elbow surgery and "now want[ed] the left elbow addressed." R.

1437. On exam, Zafar exhibited 5/5 strength, normal reflexes, and no instability or tenderness in

his upper extremities. R. 1442. He also had decreased grip-strength on the right and pain over the

lateral epicondyle on the left. R. 1437. The surgeon agreed Zafar was "[c]learly improved," but

noted it was "difficult to elicit . . . complaints" from him. R. 1437. He told Zafar, "in the absence

of significant relief of symptoms on the right, . . . [he] would not [r]ecommend operative

management on the left." *Id.* Over the next few months, Zafar frequently told medical providers

that he had ongoing bilateral elbow pain that limited his functioning. *See* R. 1452, 1461, 1474,

1481. Contemporaneous physical exams showed full strength and normal reflexes in both upper

extremities, but "[l]ateral epicondyle pain with resisted wrist extension" and occasionally

decreased range of motion or grip strength on the left. *See* R. 1453, 1562, 1481.

Zafar had left-elbow surgery in August 2013. R. 1489. Two months later, Zafar reported that he

was "doing well" and generally "happy" with his range of motion and pain level in both elbows.

*See* R. 1499. His physical exam was normal except for "minimal" tenderness over the lateral

epicondyle. *Id.*

By January 2014, however, Zafar was again reporting "persistent" symptoms—including

joint pain, swelling, and stiffness—in both upper extremities. R. 1503. On exam, he endorsed

tenderness over multiple joints and had positive Tinel's and Phalen's signs in both upper

14

extremities. R. 1503–04. His orthopedic surgeon referred him to a rheumatologist to further

evaluate lab results consistent with chronic inflammatory process. *Id.* That May, Zafar reported

"generalized joint pain" and swelling in the hands, writs, ankles, and toes starting four months

earlier. R. 3056. Those symptoms were associated with fatigue, and physical activity exacerbated

his pain. R. 3068. Physical exams in May, June, and August 2014 revealed full strength and

range of motion, but tenderness and swelling across multiple joints in both hands, elbows,

shoulders, knees, and ankles. *See* R. 3058, 3070, 3078. Erica Peart, D.O., at Duke Rheumatology

Clinic initially prescribed a prednisone taper, naproxen, and sulfasalazine to help manage Zafar's

diffuse joint pain. *See* R. 3059–60, 3074. When those failed, she started him on Humira

injections. R. 3077. Zafar lost his employer-provided health insurance in late 2014. *See* R. 3073,

3085, 3088.

      In August 2015, Zafar told rheumatologist Malithi Jayasundara, M.D., that he took

Humira for three months "and did not feel much difference" in his joint pain. R. 3085. He

stopped taking Humira when he lost his health insurance. R. 3088. Another rheumatologist put

him on methotrexate ("MTX"), gabapentin, and another prednisone taper. R. 3085–86; *see* R.

523. Zafar reported chronic diffuse joint pain with occasional swelling. R. 3086; *see also* R.

504–05, 525; R. 594. Dr. Jayasundara diagnosed seronegative arthropathy and fibromyalgia, R.

3088, and described Zafar's preexisting arthritis as "a complex disease that manifests with

multiple problems," R. 3085. She restarted the Humira. *See* R. 3094. Physical exams in August

and December 2015 revealed some tenderness in most joints and inflammation with tenderness

to palpation in the wrists, hands, and ankles. R. 3087, 3096. In December, Zafar reported that he

stopped taking MTX six weeks earlier because it caused extreme fatigue and did not help his

joint pain. *See* R. 3094. Dr. Jayasundara restarted MTX (with Humira) and explained "the

importance of continuing treatment for [a] few more months" to see if it improved his symptoms. R. 3098.

Zafar continued to report persistent joint pain, stiffness, and fatigue at office visits between February 2016 and early August 2017. *See, e.g.*, R. 583–84; R. 2256–57, 2322; R. 3102, 3110, 3121, 3127, 3138. Dr. Jayasundara's contemporaneous physical exams consistently revealed tenderness and joint inflammation in one or both shoulders and elbows, as well as both wrists, hands, and ankles. *See, e.g.*, R. 3104, 3123, 3129–30, 3141. She increased his doses of MTX, gabapentin, and Humira, and added Cymbalta and Lyrica. R. 3106, 3109, 3114, 3125, 3131–32. In February 2016, Dr. Jayasundara noted that Zafar's "fibromyalgia [was] not under control, . . . which ma[de] it difficult" to manage his arthritis and seronegative arthropathy. R. 3105. That November, Zafar complained of worsening fibromyalgia symptoms and increased, constant pain in almost all joints. R. 3121. In February 2017, Zafar reported that his insurance would not cover Humira, and he stopped taking MTX because it was not effective without the Humira. R. 3127. By August, he had restarted both medications and took them as directed. R. 617; *see also* R. 2325.

Zafar established care with Dr. Leverenz at Duke Rheumatology Clinic on August 31, 2017. *See* R. 3146–52. His "overall body pain [was] better" while doing physical therapy. R. 3146. He also reported "very painful" lesions in his mouth that had not responded to antiviral treatment. *Id.* On exam, Zafar endorsed pain to palpation in the right elbow and both wrists, hands, and feet. R. 3150. Dr. Leverenz diagnosed psoriatic arthritis "[w]ith active disease on current therapy," R. 3151, consisting of MTX, Humira, and naproxen, R. 3148–49. He continued Humira, but changed the MTX to Leflunomide because he suspected that Zafar's mouth lesions were a side-effect of that medication rather than a viral infection. R. 3149. On December 7, Zafar

told Dr. Leverenz that he had "not noticed significant improvement" since starting Leflunomide three months earlier. R. 3157; *see also* R. 2319. He endorsed "[m]ild discomfort to palpation" of both elbows and "some discomfort" in his wrists and hands. R. 3160. Lab results indicated "[h]igh severity" inflammatory disease. R. 3161. This is the last treatment note before Zafar's insured status expired on December 31, 2017. R. 3166.

Zafar continued under Dr. Leverenz's care in 2018 and 2019. *See generally* R. 3165–98. In June 2018, he reported "severe fatigue" and chronic diffuse pain. R. 3166. Dr. Leverenz noted that Zafar's psoriatic arthritis "appear[ed] well controlled," with his symptoms "predominantly reflect[ing] fibromyalgia, diabetic neuropathy, and entrapment neuropathy." R. 3165. Six months later, Zafar reported that his joints "ach[ed], but they [were] not swollen like they ha[d] been with significant flares of his arthritis in the past." R. 3175. He still took Lyrica twice daily and used Humira as prescribed. R. 3175–77. In May 2019, Dr. Leverenz added Voltaren gel to help manage diffuse pain in Zafar's hands, knees, and ankles, R. 3184, which he thought was "likely a result of enthesopathy and/or increased pain sensitivity from fibromyalgia," R. 3183. Zafar's physical exam that day revealed "no active inflammatory arthritis." R. 3183. That October, however, Zafar exhibited "substantial disease activity with tenderness to palpation in multiple joints." R. 3191; *see* R. 3195. He continued to report "substantial" pain all over his body, most significant in his knees, low back, and feet. R. 3191. Dr. Leverenz thought it would be "worthwhile at th[at] point to consider switching therapy." R. 3190. He discontinued Humira and started Zafar on Enbrel injections. *See* R. 461, 3190.

Dr. Leverenz completed an Arthritis Impairment Questionnaire in October 2019. R. 2247–54. As most relevant here, he opined that Zafar's psoriatic arthritis and fibromyalgia caused constant pain in his hands, elbows, knees, feet, and back. R. 2248, 2250; *see also* R. 461.

17

On exams, Zafar exhibited limited range of motion in the right wrist and left knee; joint tenderness in all ten fingers, both elbows, the right wrist, and the left knee; and trigger points in the soft tissue of his back. R. 2247–48. He had prescribed multiple medications trying "to produce less symptomology" without also causing intolerable or dangerous side effects. R. 2249; *see also* R. 461. "Inactivity" made Zafar's joints stiff, but "movement" made his pain worse. R. 2250; *see also* R. 2252.

Dr. Leverenz opined that Zafar's ability to work full time was "limited due to pain w[ith] any sustained activity," R. 2251, including basic daily tasks, R. 2250. During an eight-hour workday, Zafar could sit for one hour and stand/walk for less than one hour; occasionally (but not frequently) lift/carry up to ten pounds; and occasionally reach/grasp/manipulate small objects with either upper extremity. R. 2251–52. His chronic pain, fatigue, and other symptoms would "frequently" be severe enough to interfere with his attention and concentration. R. 2252. In Dr. Leverenz related Zafar's symptoms and functional limitations to "as far back as" April 2014, R. 2253, when he first established care with Duke Rheumatology Clinic, R. 461.

DDS physician Robert McGuffin, M.D., reviewed Zafar's DIB and SSI claims in September 2019. R. 120–30 (DIB); R. 133–43 (SSI). He found no medical evidence that Zafar had fibromyalgia, psoriatic arthritis, or seronegative arthritis before his insured status expired on December 31, 2017, in part because "no physical exams" from the DLI timeframe were in the record. *See* R. 125, 138. Dr. McGuffin found the evidence was "not sufficient to fully evaluate" Zafar's DIB claim. R. 130. As to the SSI claim, Dr. McGuffin opined that Zafar's "severe" ischemic heart disease, asthma, and sleep-related breathing disorder, R. 139, "currently" limited him to "light" work with occasional postural activities, R. 140–41. More specifically, Zafar could frequently lift/carry ten pounds and occasionally lift/carry twenty pounds; sit and

stand/walk for about six hours in an eight-hour workday; and occasionally crouch, crawl, kneel,

and climb ladders, ropes, or scaffolds. R. 140–41. Bert Spetzler, M.D., reviewed Zafar's DIB and

SSI claims in March 2020. R. 159, 185. Dr. Spetzler found that Zafar had "severe" fibromyalgia

and inflammatory (psoriatic) arthritis during the periods relevant to both claims in addition to the

severe cardiac impairments beginning in 2019, R. 159 (DIB); R. 180, 184 (SSI), but, like Dr.

McGuffin, found that the evidence was "not sufficient to fully evaluate" Zafar's DIB claim, R.

163. As to Zafar's SSI claim, Dr. Spetzler agreed with Dr. McGuffin that Zafar "currently" could

perform "light" work with occasional postural activities. R. 183–84.

Dr. Kweli Amusa testified as the impartial ME at the administrative hearing in March

2021. *See* R. 67–88. Having reviewed Zafar's "extensive" medical records, R. 68, Dr. Amusa

opined that Zafar's diagnosed inflammatory (psoriatic) arthritis, fibromyalgia, and epicondylitis

in both elbows were all "severe" MDIs from at least 2014 and continuing through December 31,

2017, *see* R. 70–73, 75–76, 83. These MDIs did not meet or equal the relevant Listings during

the DLI timeframe because Zafar's physical exams consistently showed only joint tenderness—

they did not also show joint deformity or "ongoing inflammation" in the joints. R. 83; *see* R. 77,

82–85. Dr. Amusa opined that the medical evidence documenting Zafar's pre-DLI condition

supported a finding that Zafar was "limited to a sedentary" RFC with only "occasional" postural

activities and "never" climbing ladders, ropes, or scaffolds or working around hazards. R. 78; *see*

*also* R. 86–88. More specifically, Zafar would have been "limited to not lifting greater than ten

pounds on occasion or [fewer] than ten [pounds] frequently," and he could only "stand and/or

walk two out of eight" hours during a normal workday. R. 88.

B.      *The ALJ's Decision*

ALJ Chambers summarized some of this evidence as part of his RFC assessment on Zafar's DIB claim. *See* R. 39–40; R. 42 (citing R. 78, 86–88, 2247–54). He found that although Zafar's severe MDIs—e.g., inflammatory psoriatic arthritis, fibromyalgia, degenerative joint disease, and epicondylitis status-post bilateral elbow surgeries—"could reasonably be expected to cause [his] alleged symptoms," R. 34, 38, "the record as a whole" did not support "work preclusive limitations" before Zafar's DLI, R. 38. *See* R. 41. ALJ Chambers explained that Zafar's "treatment notes" showed "he was doing well after undergoing right and left elbow surgeries with 5/5 motor strength and normal reflexes," R. 41 (citing Ex. 9F), and that Zafar received "conservative treatment of medication" for inflammatory arthritis and fibromyalgia, which "ha[d] been effective, although [he] was non-compliant with taking his medication," *id.* (citing Exs. 1F, 2F, 21F, 30F). Nevertheless, he gave Zafar "the benefit of the doubt" by restricting him to "light work with standing and walking for 4 to 6 hours"—as opposed to the "about 6 hours" typically required for light work—only occasional postural activities, and never climbing ladders, ropes, or scaffolds or working around hazards. *Id.* (citing R. 127–28, 158).

ALJ Chambers rejected the two medical opinions that would have limited Zafar to sedentary exertional work before his DLI. *See* R. 42. He did "not find [Dr. Leverenz's] opinions persuasive because they [were] neither supported by the medical evidence in the record nor consistent with the record as a whole." *Id.* As before, he cited "treatment notes" showing that Zafar "was doing well after undergoing right and left elbow surgeries with 5/5 motor strength and normal reflexes" and that Zafar "was receiving conservative treatment of medication" for inflammatory arthritis and fibromyalgia, which "ha[d] been effective, although [he] was non-compliant with taking his medication." R. 41. ALJ Chambers likewise did "not find Dr. Amusa's opinion persuasive" that Zafar should be limited to sedentary work before his DLI "because it is

20

not supported by the [same] medical evidence" cited above. *Id.* Dr. Amusa's opinion that Zafar

was (still) limited to sedentary work as of June 2019, however, was "persuasive . . . because it

[was] supported by the medical evidence in the record and . . . consistent with the record as a

whole." R. 44.

C.    *Analysis*

"Medical opinions"—i.e., statements from a medical source about what the claimants

"can still do despite" their MDIs and whether they have any "impairment-related limitations or

restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R.

§ 404.1513(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Woods*, 886 F.3d at 695. For

DIB claims filed after March 27, 2017, ALJs must "articulate in [the] . . . decision how

persuasive [they] find all of the medical opinions" in the record to be, 20 C.F.R. § 404.1520c(b),

using the relevant factors listed in the regulations, "as appropriate," *id.* § 404.1520c(a).

"[S]upportability and consistency are the most important factors [ALJs] consider when [they]

determine how persuasive [they find] a medical source's medical opinion . . . to be." *Id.* §

404.1520c(b)(2) (cleaned up). ALJs therefore "*will explain* how [they] considered" those two

specific factors when evaluating any medical opinion. *Id.* (emphasis added). ALJs "may, but

[generally] are not required to, explain how [they] considered" other regulatory factors, *id.*, such

as the source's medical specialty, familiarity with the record, or treating relationship with the

claimant. *See id.* § 404.1520c(b)(3).

This regulation is more flexible than its predecessor, which required ALJs to evaluate

"treating source" medical opinions under a special two-part standard and to explicitly consider

each of five regulatory factors when assigning specific weights to every medical opinion in the

claimant's record. *See, e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir.

2021) (citing 20 C.F.R. § 404.1527(c) (2016)). Even under the new regulation, ALJs "cannot reject an examining or treating [source's] opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence," *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). "To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." *Arakas*, 983 F.3d at 95 (cleaned up).

ALJ Chambers's RFC analysis does not satisfy "this deferential standard" of review. *Arakas*, 983 F.3d at 95. First, he did not mention the consistency factor at all when discussing Dr. Amusa's pre-DLI opinion. R. 42. He did mention that factor for Dr. Leverenz's opinion, but he did not logically explain why the opinion was "inconsistent" with other relevant evidence in Zafar's record. *See id.* § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the [record], the more persuasive the medical opinion(s) . . . will be."). At the very least, Dr. Leverenz's opinion about Zafar's extremely limited capacities to lift/carry and stand/walk before his DLI is consistent with Dr. Amusa's medical opinion that Zafar was limited to sedentary work during the same time. 20 C.F.R. § 404.967(a). ALJ Chambers also recognized that Zafar often complained to Dr. Leverenz and other treating specialists about diffuse joint pain, inflammation, and stiffness that seriously limited his physical functioning before his DLI, R. 39–40 (citing Exs. 1F, 2F, 9F, 21F, 30F). *See, e.g.*, R. 1452, 1461, 1474, 1481 (Ex. 9F); R. 504–05, 525 (Ex. 1F); R. 583–94, 594 (Ex. 2F); R. 2256–57, 2322 (Ex. 21F) R. 3056, 3068, 3086, 3102, 3110, 3121, 3127, 3138 (Ex. 30F). Yet, he did not explain how Dr. Leverenz's medical opinion was inconsistent with any of this evidence. R. 42. Moreover, one orthopedic treatment note showing Zafar was "doing well" after bilateral elbow surgeries in October 2013, R. 1499, "has nothing to do with [his] pain," *Mascio*, 780 F.3d

at 639, and symptoms from psoriatic arthritis and fibromyalgia starting in April 2014, *see* R. 2253. Dr. Leverenz specifically based his medical opinion on the latter impairments.

Second, ALJ Chambers did not explain why Dr. Leverenz's and Dr. Amusa's opinions were not "supported by the medical evidence" in Zafar's record. R. 42. "Supportability" looks at "objective medical evidence and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion(s)[.]" 20 C.F.R. § 404.1520c(c)(1). The "more relevant" the evidence and explanations "presented by a medical source are to support his or her medical opinion(s), the more persuasive" those opinions will be. *See id.* Dr. Amusa testified that she reviewed Zafar's "extensive" record, R. 68, and her pre-DLI sedentary RFC was "based on" relevant medical information "documented in the evidence," R. 86. *See* R. 77, 82–85. ALJ Chambers did not cite any contrary evidence or explain why he apparently disagreed with Dr. Amusa's conclusion on that point. *See Arakas*, 983 F.3d at 95.

Finally, ALJ Chambers's evaluation of Dr. Leverenz's and Dr. Amusa's opinions was "based on an incorrect legal standard as well as a critical misunderstanding of fibromyalgia," *Arakas*, 983 F.3d at 98. *See* R. 42. In *Arakas*, the Fourth Circuit held that "ALJs may not rely on objective medical evidence (or lack thereof)—even as just one of multiple factors—to discount" subjective statements, or medical opinions, "regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." 983 F.3d at 97; *see id.* at 108–09 (extending this rule to medical opinions describing a fibromyalgia patient's impairment, symptoms, or resulting limitations). The court explained, "[o]bjective indicators such as normal clinical [examinations] and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease." *Id.* at 97. "[P]hysical examinations of patients with fibromyalgia will usually yield normal results—a full

range of motion, no joint swelling, as well as normal muscle strength and neurological

reactions." *Id.* at 96 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003)

(cleaned up)). Thus, ALJ Chambers could not rely on Zafar's "5/5 motor strength and normal

reflexes," R. 42, to discount these physicians' opinions describing debilitating fibromyalgia pain.

His reliance on Zafar's purportedly "conservative treatment with medications," R. 42, is also

legally flawed because such treatment is "wholly consistent with how fibromyalgia is treated

generally," *Arakas*, 983 F.3d at 102. Zafar "cannot be faulted 'for failing to pursue non-

conservative treatment options where none exist.'" *Id.* (quoting *Lapeirre-Gutt v. Astrue*, 382 F.

App'x 662, 664 (9th Cir. 2010)).

The ALJ's assessment Dr. Leverenz's and Dr. Amusa's medical opinions—and as a

result, the ALJ's pre-DLI RFC determination—are not supported by substantial evidence in

Zafar's record.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**GRANT** Zafar's motion for summary judgment, ECF No. 12, and **DENY** the Commissioner's

motion for summary judgment, ECF No. 19; **REVERSE** the Commissioner's final decision

denying Zafar's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. §

405(g); and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: September 15, 2023

Joel C. Hoppe
United States Magistrate Judge